IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANNIE B. CLAUSELL,            *
                              *
     Plaintiff,               *
                              *
vs.                           *  Civil Action No.04-00193-BH-B
                              *
JO ANNE B. BARNHART,          *
Commissioner of               *
Social Security,              *
                              *
     Defendant.               *

## REPORT AND RECOMMENDATION

Plaintiff Annie B. Clausell ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383c.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The parties waived oral argument.  Upon consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

On October 9, 2002, Plaintiff protectively filed an application for supplemental security income benefits, alleging that she has been disabled since March 1, 2002 due to severe, recurrent, major depressive disorder, with psychotic features

(including "hearing voices"), diabetes mellitus and high blood pressure. (Tr. 11, 20, 24-25, 42-44). Plaintiff's initial application was denied and she filed a Request For Hearing before an Administrative Law Judge ("ALJ").[1] (Id. at 24-31). ALJ James D. Smith conducted a hearing on May 6, 2003, which was attended by Plaintiff and her counsel. (Id. at 194-208). On October 16, 2003, the ALJ entered a decision, (id. at 11-21), wherein he found that while Plaintiff has the severe impairments of diabetes mellitus, hypertension and major depressive disorder, she retains the residual functional capacity to perform work requiring medium exertion such that she can return to her past relevant work as a laundry presser/laundry machine operator and cleaner/housekeeper, as those jobs are customarily performed in the national economy. (Id. at 20, Findings 2, 4, 7-8). Plaintiff sought review before the Appeals Council, which denied same on March 4, 2004, making it the final decision of the Commissioner of Social Security. (Id. at 4-7, 189-193). See 20 C.F.R. § 404.981; 20 C.F.R. § 416.1481. The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

---

[1]Plaintiff's application was treated as a prototype case and thus, the reconsideration step was eliminated. 20 C.F.R. § 416.1406.

## II.  **Background Facts**

Plaintiff was born on March 6, 1947 and was approximately 56 years old at the time of the administrative hearing.  (Tr. 198).  Plaintiff testified that she lives alone,[2] and has no income source other than food stamps.  (Id.)  Plaintiff further testified that she has an 11th grade education, that she has been unemployed for 5 years, and that she last worked for a cleaners. (Id. at 198-199).  According to Plaintiff, she stopped working because of her health.  (Id. at 199).  Plaintiff claims problems with depression, diabetes and hypertension.  (Id. at 200-207). According to Plaintiff, she hears voices all the time when she is awake, the voices are "very annoying" and they result in her being unable to perform the duties of her job.  (Id. at 203-204).

Plaintiff testified that she has been treated by Dr. Charles Smith at the Mobile Mental Health Center for over one year and that she has been prescribed Zyprexa and Seroquel, but that the medicine has not stopped the voices.  (Tr. at 201-202). Plaintiff also indicated that the medicine causes drowsiness, and that at one point, Dr. Smith reduced her Zyprexa dosage because she was "doz[ing] off".  (Id. at 203).  Plaintiff

---

[2]According to Plaintiff, she has been separated from her husband for 18 years. (Tr. 198).

further testified that because of "the voices," she has problems concentrating and has memory lapses. (<u>Id</u>. at 203-204). Additionally, Plaintiff testified that her doctors have prescribed medication for her diabetes, and placed her on a special diet, with which she complies. (<u>Id</u>. at 204-205). Plaintiff also testified that she has been prescribed Norvasc for her hypertension, and that it keeps her blood pressure under control unless she eats something that she is not supposed to eat. (<u>Id</u>.)

As to her daily activities, Plaintiff testified that she cooks, cleans house, goes to the grocery store (with a friend who helps her see the prices), and attends bingo twice a week. (<u>Id</u>. at 204, 206). Plaintiff also testified that she knows how to drive, but has become too nervous to do so. (Tr. 198, 205). She further testified that she smokes one-half of a pack of cigarettes per day, has not used alcoholic beverages in over 3 years (that she stopped drinking when she started hearing voices), and that while she has used marijuana in the past, has not done so in 10 years. (<u>Id</u>. at 199-200).

## III. <u>Issues on Appeal</u>

Whether the ALJ erred, by failing to properly evaluate Plaintiff's mental impairment and develop the record as to the functional limitations imposed by same by not seeking vocational

expert testimony and by not ordering a consultative examination, since severe non-exertional impairments were alleged, thus making it unclear whether she was capable of performing a full range of medium work?

## IV. <u>Analysis</u>

### A.   <u>Standard of Review</u>

In reviewing claims brought under the Act, this court's role is a limited one.  The court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990)[3].  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a

_____

[3]This court's review of the Commissioner's application of legal principles is plenary.  <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

conclusion[]").   In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. Lexis 10163 (S.D. Ala. 1999).

**B.**   **<u>Discussion</u>**

An individual who applies for Social Security disability benefits must prove her disability.  <u>See</u> 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.  20 C.F.R. §§ 404.1520 and 416.920.[4]

---

[4]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their

In case <u>sub judice</u>, the ALJ applied the five-step process in evaluating Plaintiff's claim, and concluded, at steps one and two, that she has not engaged in substantial gainful activity since her alleged onset of disability, and that she has the impairments of diabetes mellitus, hypertension and major depressive disorder, which are "severe" within the meaning of the Act. (Tr. 20, Findings 1-3). The ALJ found at step three, that Plaintiff's impairments, singly or in combination, do not meet or equal the listings. (<u>Id</u>., Finding 2). The ALJ also determined that Plaintiff's allegations of pain and functional limitations, to the degree alleged, are not supported by the evidence in the record. (<u>Id</u>., Finding 3). Next, at step four, the ALJ found that Plaintiff possesses the residual functional capacity to perform a full range of work activities at the

---

past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. <u>Id</u>. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

medium exertional level on a regular and sustained basis. (Id.,
Finding 4).  The ALJ additionally noted that Plaintiff's past
relevant work, as a laundry presser/laundry machine operator and
cleaner/housekeeper, is not precluded by this residual
functional capacity as those jobs are customarily performed in
the national economy.  (Id., Findings 7-8).  As such, the ALJ
determined that Plaintiff was not disabled at step four, as she
could perform her past relevant work, thus terminating the
sequential evaluation process.

Plaintiff does not take issue with the ALJ's findings in the
first three steps of the sequential analysis.  Rather, Plaintiff
alleges that the ALJ erred in his step four analysis.
Specifically, Plaintiff argues that the ALJ failed to properly
analyze her severe mental impairment, and that the ALJ should
have: 1) obtained VE testimony; and 2) ordered a consultative
examination.  (Doc. 14).  Based upon a review of the record
evidence, the undersigned finds that the ALJ did not err.

With respect to Plaintiff's mental impairment, the record
evidence reveals that she received treatment at Franklin Primary
Health Center, Inc. (hereinafter "FPHC"), the University of
South Alabama Medical Center (hereinafter "USA"), and the Mobile
Mental Health Center (hereinafter "MMHC").  The FPHC records
reflect, in pertinent part, that:

- <u>May 12, 1999</u> (Tr. 150): Plaintiff was seen for complaints of her feet cramping and swelling and also due to difficulty sleeping.  She reported that she had recently lost her brother, and was very upset about his death.

- <u>August 4, 2000</u> (<u>Id</u>. at 138-139): Plaintiff was seen for a follow-up from a prior hospital visit for nose bleeding.  She was upset over family problems, and indicated that she was on multiple medications which she was unable to afford. Plaintiff was prescribed Zyprexa.

- <u>August 24, 2000</u> (<u>Id</u>. at 136-137): Plaintiff reported having an anxiety reaction to her medication, and was prescribed Prozac and Zyprexa.

- <u>August 22, 2001</u> (<u>Id</u>. at 130-131): Plaintiff appeared depressed, and she reported restlessness, decreased appetite and the "shakes." She expressed worry over the loss of her house due to a fire, and the deaths of multiple family members within the last two years.  She also reported an anxiety reaction to her medication.  Her diagnosis included depression, and her medications were refilled.

- <u>November 20, 2001</u> (<u>Id</u>. at 128-129): Plaintiff reported she was "[d]oing well. No change in status[,]" except for numbness in her head.

- <u>February 19, 2002</u> (<u>Id</u>. at 126-127): Plaintiff complained of being unable to sleep at night and feeling distressed, nervous and restless.

- <u>March 25, 2002</u> (Tr. at 124-125): Plaintiff reported that she was "[d]oing very good" except for complaints of sleeplessness at night.

- <u>September 30, 2002</u> (<u>Id</u>. at 120-121): Plaintiff reported having suffered abuse in the past.

The record also reveals that Plaintiff was treated as an outpatient at USA from August 21, 2001 through February 19,

9

2002, and the USA records reflect, in relevant part, as follows:

- <u>August 21, 2001</u> (<u>Id</u>. at 89-94): Plaintiff was treated for heart fluttering, at which time she also reported insomnia, anxiety and feeling like she was going to have a nervous breakdown; she was diagnosed with anxiety and hypokalemia.

- <u>August 22, 2001</u> (<u>Id</u>. at 95): Plaintiff was treated as an outpatient for ams/hearing voices; she was diagnosed with psychosis, NOS, DM2 and hypokalemia.

- <u>August 23, 2001</u> (<u>Id</u>. at 96): Plaintiff had a psychiatric consultative exam, at which time she reported hearing voices telling her that she will be killed and that her house would be "put under fire." Plaintiff stated that the voices started 3 days after heavy drinking. Plaintiff reported that she does not sleep, feels restless and has become suspicious. She attributed the condition to the death of her brother, mother and father in the past 2 years. Plaintiff stated that she was seen for a brief time by Dr. Smith at MMHC but stopped going because she does not have a car. Plaintiff also admitted that she drinks more than she should.[5] The examination notes reflect that Plaintiff was anxious, suspicious, coherent and fluent, and was hearing voices talking to her about hurting her and burning down her house. Plaintiff also reported her belief that people can take away her thoughts or insert theirs into her head. Plaintiff did not know the name of the current president. The impression was psychosis NOS; it was recommended that Plaintiff be sent to MMHC.

- <u>October 8, 2001</u> (<u>Id</u>. at 101-102): Plaintiff was treated as an outpatient for complaints of side head numbness with dizziness and blurred vision. Additionally, an abrasion to her scalp was noted.

---

[5]There are no mental health records, however, in the evidence of record which show any mental health treatment at MMHC before March 2002.

The record also contains treatment records which reflect
that Plaintiff was treated, from March 2002 through May 2003 at
MMHC, for major depressive disorder by psychiatrist Dr. Charles
E. Smith, (hereinafter "Dr. Smith").  The MMHC notes reflect,
in pertinent part, as follows:

- <u>March 28, 2002</u> (Tr. 114-117): Plaintiff was
  initially examined by Dr. Smith for complaints of
  an inability to sleep, hearing voices and a
  feeling of "I'm at the bottom again[]" and am
  "not good." (<u>Id</u>. at 114).  Plaintiff reported
  that she lost her job when the restaurant closed
  and that in the past year, she suffered the
  deaths of her brother and sister, and her house
  burned down as well.  Plaintiff reported having
  been treated intermittently in the past for
  depression, "voices," an alcohol problem, as well
  for diabetes mellitus and hypertension with Dr.
  Carroll.  Plaintiff reported a long history of
  alcohol problems and that she drank when
  depressed. (<u>Id</u>. at 115).  Plaintiff reported
  being married for about 35 years to a man who was
  physically abusive. (<u>Id</u>. at 116).  The treatment
  notes reflect that Plaintiff's mood was
  depressed, her affect was appropriate, her memory
  appeared good, there was no evidence of a
  thinking disorder, and her perception included
  "voices." (<u>Id</u>.)  Plaintiff was diagnosed with
  major depressive disorder, recurrent and severe,
  with psychotic features, alcohol abuse, diabetes
  and hypertension. (<u>Id</u>. at 117).  Treatment with
  Dr. Smith was initiated and Plaintiff was
  prescribed an anti-psychotic medication. (Tr.
  117).  Plaintiff's GAF was estimated at 65.
  (<u>Id</u>.)

- <u>April 3, 2002</u> (<u>Id</u>. at 113): An interdisciplinary
  treatment plan was completed for Plaintiff which
  listed her diagnosis as major depressive
  disorder, recurrent and severe, with psychotic
  features, alcohol and cannabis abuse, that she

11

was a diabetic, had hypertension, and had a current GAF 55 with 55 as her highest in the past year. It was noted that Plaintiff had the support of friends, was capable of insight into problems, was motivated for treatment and had a good social support network.

- June 10, 2002 (Id. at 112): Plaintiff presented as a walk-in and complained of increased auditory hallucinations, poor sleep patterns, nervousness and depression, for which she received a psychiatric consult and was advised to continue her medication and decrease her caffeine intake. The notes reflect that Plaintiff's appearance was appropriate, her behavior was normal, her mood/affect were sad, no speech impairment was detected, her appetite was good and her sleep was poor with nightmares. No self injurious behavior, or suicidal/homicidal thoughts were noted; however, Plaintiff reported having auditory hallucinations. Her memory was forgetful, but no impairments in concentration were noted.

- June 24, 2002 (Id. at 111): Dr. Smith's notes reflect that Plaintiff reported feeling "empty" due to the loss of relatives during the past year and complained of "voices." She also indicated that she lost her last job due to a misunderstanding. The notes further reflect that Plaintiff's appearance/affect were normal, her behavior/mood were normal, no speech impairments were noted and she had good appetite/sleep. No self injurious behavior or suicidal/homicidal thoughts were noted. Additionally, the notes reflect that Plaintiff's memory was unimpaired and that her thoughts were logical. Under the perceptions category, Dr. Smith indicated "None."[6] There was no change in Plaintiff's diagnosis.

--------

[6]Under the perceptions category, boxes were provided for WNL (within normal limits), Auditory hallucinations present, and Visual hallucinations present. (Tr. 111). There was also a space provided for a description of any such perceptions. (Id.)

- <u>July 3, 2002</u> (<u>Id</u>. at 110): The treatment notes reflect that Plaintiff's current symptoms were not assessed during this 90 day review; however, it was observed that Plaintiff appeared to be making progress toward most of her goals.  It was also noted that Plaintiff continued to experience auditory hallucinations and that she would be encouraged to participate in therapy and continue her current plan.

- <u>July 31, 2002</u> (Tr. 109): Dr. Smith's notes reflect that Plaintiff continued to report hearing voices. Plaintiff indicated that she heard the voice of the same man all the time, and that he was threatening harm to her. Plaintiff was described as "very distraught," and it was noted that the voice was tormenting her all the time.   Dr. Smith noted that Plaintiff was understandably discouraged that the three medications that she had been prescribed were not working, and discussed with her at length the need for a "leaner" dosage of medication.  He recommended increasing one of her medications to 600 m.g.   Dr. Smith notes reflect that Plaintiff's appearance/affect were appropriate, her behavior/mood were normal, no speech impairments were noted and that she had good appetite/sleep.  No self injurious behavior or suicidal/homicidal thoughts were noted. Additionally, the notes reflect that Plaintiff's memory was unimpaired and that her thoughts were logical.  Under the perceptions category, Dr. Smith indicated that auditory hallucinations ("always the same man") were present.  Plaintiff was compliant with her medication and there was no change in the diagnosis.

- <u>September 18, 2002</u> (<u>Id</u>. at 108): Plaintiff was seen by a nurse and reported that she was "not doing good," that her medication was not working, and that she was still hearing voices.  Plaintiff also complained of difficulty sleeping, and reported that she was thrown out of her house recently.  Plaintiff resisted an increase in her anti-psychotic medication because she reported that it makes her heart flutter.   The notes

reflect that her appearance was appropriate, her mood/affect were sad, her appetite/sleep were good, she had no self-injurious behavior or suicidal/homicidal thoughts, and her thoughts were logical and within normal limits. The notes reflect that she was to discontinue Seroquel and began Zeprexa.

- October 4, 2002 (Id. at 107): Plaintiff's 90 day treatment plan was reviewed and it was noted that she had made good progress, attended all of schedule appointments, but that she continued to experience auditory hallucinations daily. She denied suicidal/homicidal ideations or manic symptoms or the need for individual therapy.

- October 16, 2002 (Id. at 106): Dr. Smith noted that Plaintiff looked good, "well turned out," but just "down on her luck." His notes also reflect that her appearance/affect were appropriate, her behavior/mood were normal, no speech impairment was noted, her appetite/sleep were good, no self-injurious behavior or suicidal/homicidal thoughts were reported, her memory was unimpaired and her thoughts were logical and coherent. Under the perceptions category, Dr. Smith indicated "None." There was no change in Plaintiff's diagnosis.

- November 20, 2002 (Id. at 187): Dr. Smith noted that Plaintiff seemed down and out. She reported that she was living with a friend and collecting food stamps. Plaintiff also insisted that the medicine has not helped her much. She reported that the voices were still there, but only "dimmer," and that she had applied for disability because she cannot work anymore. Dr. Smith's notes reflect that Plaintiff's appearance/affect were appropriate, her mood/behavior were normal, her appetite was good, her sleep was fair, her memory and concentration were unimpaired, her thoughts were logical/coherent/within normal limits, she had no self injurious, suicidal or homicidal thoughts, and she was compliant with her Zyprexa medications. Under the perceptions category, Dr. Smith indicated "None." There was

no change in Plaintiff's diagnosis.

• <u>January 3, 2003</u> (<u>Id</u>. at 186): Plaintiff's symptoms were not assessed during her 90 day plan review. The notes reflect that she appeared to make progress toward her treatment goals during the past 90 days. Plaintiff had attended all appointments and complied with medications; however, she continued to experience auditory hallucinations every day of the week. She reported that the voices "are dimmer," and that she was experiencing stressors such as no permanent housing, limited income and inability to work.

• <u>February 4, 2003</u> (Tr. 185): Plaintiff was seen as a walk-in at which time Dr. Smith noted she reported that she was sleeping better but was still hearing voices. The notes also reflect that she was compliant with medications, her appearance/affect were appropriate, her mood/behavior were normal, her appetite/sleep were good, her memory and concentration were unimpaired, her thoughts were logical/coherent/within normal limits, she had no self injurious behavior or suicidal/homicidal thoughts, and her perceptions were within normal limits.

• <u>May 13, 2003</u> (<u>Id</u>. at 184): Plaintiff was seen as a walk-in at which time she reported that she was still feeling depressed, was still hearing voices (but no commands) and did not believe that the medication was working. She denied any other medical problems other than hypertension and NIDDM. It was noted that Plaintiff had missed her last two scheduled appointments with Dr. Smith and that she reported that she needed to have him complete her disability paperwork. The notes also reflect that Plaintiff's appearance/affect were appropriate, her mood was not good-depressed, no speech impairment was noted, her appetite was fair, she reported difficulty falling asleep and nightmares, she denied self injurious behavior or suicidal/homicidal thoughts, she reported auditory hallucinations

(hearing voices), and her memory was impaired. It was further noted that Plaintiff was compliant with her medication (Zyprexa).

- <u>May 14, 2003</u> (<u>Id</u>. at 183): Dr. Smith saw Plaintiff the following day, and noted that she made an "excellent presentation as she comes in to seek papers for disability." He observed that Plaintiff's appearance/affect were appropriate, her behavior/mood were normal, no speech impairment was noted, her sleep/appetite were good, she did not have any self injurious behavior or suicidal/homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical, she had no concentration impairments and she was compliant with her medication. There was no change in her diagnosis.

The foregoing constitutes the substance of the medical records regarding Plaintiff's mental impairments. A review of the ALJ's decision reflects that he reviewed the pertinent portions of said records, as well as information provided by Plaintiff regarding her daily activities and her past relevant work. As noted <u>supra</u>, the ALJ determined, at step four of the sequential evaluation process, that Plaintiff retained the residual functional capacity to perform her past work. In her brief, Plaintiff argues that "[r]egardless of whether her physical limitations would allow . . . [her] to function at the stated exertional level, the mental limitations would not." (Doc. 14 at 5). At step four of the analysis, the burden is on the claimant to show that she can no longer perform her former work because of her impairments. <u>Jones v. Bowen</u>, 810 F.2d 1001

(11th Cir. 1986).   In evaluating whether the claimant has met this burden, the examiner must consider the following factors: 1) objective medical facts and clinical findings; 2) diagnoses of examining physicians; 3) evidence of pain; and 4) the claimant's age, education and work history.   Id at 1005.

Section 404.1520(e) of the Commissioner's regulations require a review and consideration of a plaintiff's residual functional capacity and the physical and mental demands of the past work before a determination can be made that the claimant can perform her past relevant work.   Residual functional capacity is a measure of what a claimant can do despite limitations. 20 C.F.R. § 404.1545.   It is the function of the ALJ to determine the claimant's residual functional capacity through examination of the evidence and resolution of conflicts in the evidence.   Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996).   An ALJ must base the assessment upon all of the relevant evidence of a claimant's remaining ability to do work, notwithstanding her impairments.   Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. §§ 404.1546 and 404.1527.

In finding that a claimant has the capacity to perform a past relevant job, the decision of the Commissioner must contain among the finding, a finding of fact as to the claimant's residual functional capacity, a finding of fact as to the

17

physical and mental demands of the past job occupation, and a finding of fact that the claimant's residual functional capacity would permit a return to the past job or occupation. In this case, the ALJ concluded that there was "no evidence that the claimant's mental impairment, which appears to be relatively well controlled with medication, causes her any significant mental functional limitation that would prohibit her performance of semi-skilled work activities." (Tr. 16). In reaching this conclusion, the ALJ found that:

> The evidence establishes that the claimant's impairment has not prevented her from performing her activities of daily living independently, from shopping, or from engaging in social activities. In fact, the evidence documents the relative success of claimant's treatment for her major depression and her major complaint of auditory hallucinations, and it shows that the claimant's mental health symptomatology has responded well to medications, which have proven successful in maintaining control of her condition and mitigating the accompanying symptomology. It is noteworthy that, at the time of the claimant's last visit with Dr. Smith in May, 2003, he noted that she made "excellent presentation," and he further noted no abnormalities in his assessment of the claimant's current symptoms. . . .

(Id. at 17). Utilizing the special technique required for evaluating mental impairments under 20 C.F.R. § 416.920a(e), the ALJ's decision included a specific finding as to the degree of limitation in each of the functional areas.

Specifically, the ALJ determined that there is no evidence that Plaintiff suffers from any significant degree of limitation

in her activities of daily living as she is able to care for her
own personal needs without assistance, do routine household
chores, do her own shopping and prepare and cook meals. (Tr.
17). With respect to Plaintiff's social functioning, the ALJ
noted that the "claimant has demonstrated the ability to
interact appropriately with others inasmuch as she is able to
attend 'bingo' twice weekly and maintain friendships." (Id.)
According to the ALJ, Plaintiff has not reported any
difficulties getting along with others, nor do Dr. Smith's
treatment records reflect any such limitations. (Id.) As such,
the ALJ concluded that the evidence does not establish that
Plaintiff possesses more than a mild degree of impairment in her
ability to maintain social functioning. (Id.) With respect to
concentration, persistence or pace, the ALJ found that Dr.
Smith's treatment notes, during the relevant period,
consistently reflect that Plaintiff had no impairment in her
memory or concentration and that her thoughts were logical,
coherent and within normal limits. (Id.) The ALJ also
acknowledged that while Plaintiff's reports of auditory
hallucinations would inhibit her ability to effectively maintain
concentration and attention, Dr. Smith's treatment notes reflect
that this symptom improved with treatment, and that she had not
had any perceptual disturbances since November 2002. (Id.)

Additionally, the ALJ determined that the treatment notes were devoid of any evidence that Plaintiff experienced any episodes of deterioration or decompensation.  (Id. at 17-18).

Based upon a careful review of the record evidence, including Dr. Smith's treatment notes and Plaintiff's testimony at the hearing, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff's mental impairment does not impose any significant work-related limitations.  Simply put, neither the medical evidence, nor Plaintiff's testimony regarding her daily activities, contradicts the ALJ's findings.  In fact, during Plaintiff's final May 2003 visit to Dr. Smith, he did not impose any restrictions on her, notwithstanding the fact that she advised him that she was seeking disability.  Instead, Dr. Smith noted that Plaintiff made an "excellent presentation," and found that her perception was within normal limits, her memory and concentration were unimpaired, and her thoughts were logical and coherent.  (Tr. 183).  Accordingly, the undersigned finds no error in the ALJ's determination.

The ALJ also determined that Plaintiff has past relevant work experience as a laundry presser/laundry machine operator and as a cleaner/housekeeper, and noted that according to the Dictionary of Occupational Titles, (hereinafter "DOT"), the job

of laundry presser/laundry machine operator is classified as medium, semi-skilled work, and the job of cleaner/housekeeper is classified as light unskilled work. (Tr. 19). The ALJ also expressly referenced the appropriate DOT code numbers, namely 369.684-014 and 323.687-014, which contain the physical and mental demands for the referenced positions. (Id.) The ALJ then concluded, "[a]fter carefully considering all of the evidence, including the claimant's testimony and the effects of her impairments . . . the claimant . . . [is] physically and mentally capable of performing her past relevant work as a laundry presser/laundry machine operator and a cleaner/housekeeper, as she actually performed those jobs and as those jobs are customarily performed in the national economy." (Id. at 19-20).

Based upon a review of the record, the undersigned finds that Plaintiff's contention, that the ALJ erred in determining that she could return to her past relevant work, is without merit. The substantial record evidence demonstrates that the ALJ properly considered the duties and responsibilities of Plaintiff's past work, and determined that she retains the residual functional capacity to return to such work.

Additionally, the undersigned finds that the ALJ did not err in failing to obtain Vocational Expert testimony at step

four of the sequential evaluation process.  (Doc. 14).  In this Circuit, "[t]he testimony of a vocational expert is only required to determined whether the claimant's residual functional capacity permits . . . [her] to do other work after the claimant has met . . . [her] initial burden of showing that . . . [she] cannot do past work." Schnorr v. Brown, 816 F.2d 578, 582 (11th Cir. 1987). See also Lamb v. Bowen, 847 F.2d 698, 704 (11th Cir. 1988) (same).  In the case sub judice, the ALJ found that Plaintiff retains the residual functional capacity to perform her past relevant work, and therefore, there was no legal requirement for the ALJ to procure the testimony of a vocational expert. See, e.g., Cole v. Chater, 1997 U.S. Dist. LEXIS 6442, *47-48 (S.D. Ala. Jan. 7, 1997).

The undersigned also rejects Plaintiff's contention that the ALJ erred by failing to order a consultative examination. (Doc. 14).  In this case, the ALJ determined that he had all of the medical evidence necessary to enable him to make a determination as to Plaintiff's functional capacity.  Although consultative examinations are not required by statute, the Regulations provide for them where warranted.  20 C.F.R. §§ 404.1517 and 416.917.  Additionally, 20 C.F.R. §§ 404.1519a and 416.919a provide, in relevant part, as follows:

> (a)(1) General.  The decision to purchase a consultative examination for you will be made after we

22

have given full consideration to whether the
additional information is needed (e.g. clinical
findings, laboratory tests, diagnoses, and prognosis)
is readily available from the records of your medical
sources . . . .

* * *

(b) Situations requiring a consultative examination.
A consultative examination may be purchased when the
evidence as a whole, both medical and non-medical, is
not sufficient to support a decision on your claim.
Other situations listed below, will normally require
a consultative examination: (1) the additional
evidence needed is not contained in the records of
your medical sources; . . . .

20 C.F.R. § 404.1519a. While it is reversible error for an ALJ

not to order a consultative examination when such evaluation is

necessary for him to make an informed decision, Reeves v.

Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984), the ALJ is not

required to order a consultative examination unless the record

establishes that such an examination is necessary to enable the

ALJ to render a decision.[7]  See, e.g., White v. Barnhart, 373 F.

Supp. 2d 1258, 1266 (N.D. Ala. 2005); Cole, 1997 U.S. Dist.

LEXIS 6442, *42-45.  Contrary to Plaintiff's contention, the

instant record does not demonstrate that a consultative

examination was necessary.  The ALJ had adequate information to

---

[7]See also Wind v. Barnhart, 133 Fed. Appx. 684, 693 (11th Cir.
2005) (unpublished opinion); Dixon v. Apfel, 2000 WL 1844689 (S.D.
Ala. Nov. 8, 2000); Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir.
1988); Cowart v. Schweiker, 662 F.2d 731, 735-736 (11th Cir. 1981);
Smith v. Schweiker, 677 F.2d 826, 829 (11th Cir. 1982); Nelms v.
Bowen, 803 F.2d 1164, 1165 (11th Cir. 1986); Welch v. Bowen, 854 F.2d
436, 438 (11th Cir. 1988).

assess   Plaintiff's   residual   functional   capacity   and physical/mental impairments properly.[8]

Indeed, Plaintiff fails to point to any specific "gap" in the record for which a consultative examination was necessary. Moreover, the record contains a consultative exam conducted at USA (Tr. 96), as well as Plaintiff's treatment records from FPHC and MMHC. See supra. As noted infra, the ALJ considered this evidence and relied on such evidence in concluding that Plaintiff's impairments were not disabling. Dr. Smith's treatment notes reflect that after Plaintiff began treatment at MMHC, she responded well to medications, her memory and concentration were unimpaired and her perceptions were within normal limits. During Plaintiff's last visit with Dr. Smith in May 2003, he observed that she had "an excellent presentation," and did not note any abnormalities. (Tr. 183). The record does not contain any evidence that conflicts with Dr. Smith's findings, nor does it contain evidence that suggests any

---

[8]See, e.g., Moreno v. Barnhart, 2003 WL 22244971, *3 (W.D. Tex. Sept. 3, 2003) (holding that while the ALJ found the claimant to have a depressive disorder, the disorder did not restrict his daily activities and resulted in only "mild" social functioning difficulties and "moderate" difficulties in maintaining concentration, persistence, and pace with no episodes of decompensation, and thus, the claimant failed to raise the requisite suspicion that a psychiatric consultative examination was necessary for the ALJ to discharge the duty of full inquiry, particularly because, in part, the medical records discussing the claimant's depression were in the record and the ALJ had explicitly considered those materials).

uncertainty as would require further information to enable the ALJ to render a decision.  <u>See</u>, <u>e.g</u>., <u>Kilcrease v. Barnhart</u>, 347 F. Supp. 2d 1157, 1162 (M.D. Ala. 2004).  In the absence of any conflicting or uncertain evidence, the ALJ acted properly in rendering a decision based upon the record that was before him.  <u>See</u>, <u>e.g</u>., <u>Street v. Barnhart</u>, 340 F. Supp. 2d 1289, 1293 (M.D. Ala. 2004), <u>aff'd</u>., 133 Fed. Appx. 621 (2005).

**V.   Conclusion**

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income benefits is due to be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation.</u>

**DONE** this the **26**<sup>th</sup> day of **September 2005.**

                              _____/s/ Sonja F. Bivins_____
                              **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.   **<u>Objection</u>**.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.   Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **<u>Opposing party's response to the objection.</u>**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **<u>Transcript (applicable where proceedings tape recorded)</u>**.
Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the
magistrate judge finds that the tapes and original records in
this action are adequate for purposes of review.  Any party
planning to object to this recommendation, but unable to pay the
fee for a transcript, is advised that a judicial determination
that transcription is necessary is required before the United
States will pay the cost of the transcript.

                    **/s/ SONJA F. BIVINS**
              **UNITED STATES MAGISTRATE JUDGE**

27